839 A.2d 245

COMMONWEALTH of Pennsylvania, Appellee

v.

Billy BROOKS, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 21, 2003.

Decided Dec. 30, 2003.

George Henry Newman, Philadelphia, for Billy Brooks appellant.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, for the Com. of PA, appellee.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ

## *OPINION*

Justice NIGRO.

Following a jury trial, Appellant Billy Brooks was found guilty of first-degree murder and possession of an instrument of crime ("PIC"). The jury returned a verdict of death, and on January 23, 1992, the trial court formally imposed the death sentence. Appellant filed post-sentence motions, which the trial court denied. This direct appeal followed, and we now reverse and remand the matter for a new trial.[1]

On December 26, 1990, Appellant, an inmate at Holmesburg prison, stabbed and killed another inmate, Eric Vaughn, during an argument over a bathrobe. Appellant was subsequently charged with first-degree murder, PIC, and conspiracy. Thomas Turner, Esquire[2] was appointed to represent Appellant. Jury selection for Appellant's trial began on January 7, 1992, at which time Appellant informed the trial court that he was so dissatisfied with Mr. Turner's representation that he requested permission to represent himself.[3] The trial court allowed Appellant to proceed *pro se*, with Mr. Turner serving

1. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review a judgment of a sentence of death.

2. It appears that Mr. Turner was suspended from the practice of law on October 26, 1993, and has not applied for readmission.

3. On the first day of jury selection, Appellant informed the trial court that he had never met his attorney and that he did not believe that Mr.

as standby counsel. After Appellant was granted permission to represent himself, he and Mr. Turner essentially took turns presenting Appellant's case to the jury.[4] The jury ultimately found Appellant guilty of first-degree murder and PIC, but acquitted him of conspiracy. Following the penalty hearing, the jury concluded that the two aggravating circumstances it found outweighed the one mitigating circumstance it also found, and returned a verdict of death.[5]

■ In his appeal to this Court, Appellant raises numerous claims of the ineffective assistance of his trial counsel, includ-

Turner was prepared to defend him. N.T., 1/7/1992, at 113–15, 118–19. The next day, at the outset of the proceedings, Mr. Turner informed the court that Appellant wished to represent himself. N.T., 1/8/1992, at 4. The court asked Appellant to reconsider his request to proceed *pro se,* given that Mr. Turner wanted to obtain an acquittal for him. N.T., 1/8/1992, at 10. Appellant responded: "well, let me say this here: how would you say he's trying to get me acquitted, sir, when he has been my lawyer for four months, I talked to him one time on the phone, he never returned my phone calls, he never returned my mail...." *Id.* A few days later when the Commonwealth commenced its case-in-chief, Appellant was again questioned about his decision to represent himself, to which he responded: "I'm saying the reason that I chose to represent myself is because I know that I will put forth an effort.... Now, the reason why I don't feel as though Thomas Turner is with me all the way is because he has been my lawyer for four months and I have never got to speak even to him. I've never got to see him concerning this case, but on the day that we started picking the jury. This is why I chose to go ahead and represent myself." N.T., 1/13/1992, at 10–11.

4. During *voir dire,* Mr. Turner conducted the questioning of prospective jurors. N.T., 1/8/1992, at 43–44. At the suppression hearing, Appellant began representing himself, but when the court strongly advised Appellant to let Mr. Turner take over, Appellant agreed. N.T., 1/10/1992, at 65–66. When the trial began, Appellant made his opening statement and cross-examined the Commonwealth's witnesses throughout the first day, but ceded his representation to Mr. Turner on the second day, and for the remaining ten days of the trial.

5. Specifically, the jury found: (1) that Appellant had a significant history of felony convictions involving the use or threat of violence, 42 Pa.C.S. § 9711(d)(9); and (2) that he had been convicted of another federal or state offense for which a sentence of life imprisonment or death was imposable, or was undergoing a sentence of life imprisonment at the time of the commission of the offense, 42 Pa.C.S. § 9711(d)(10). Although Appellant did not permit Mr. Turner to present any evidence of mitigating circumstances, the trial court instructed the jury to consider whether there was any evidence of mitigation concerning the character and record of Appellant and the circum-

ing a claim that trial counsel was ineffective for failing to meet with him at all prior to his trial.[6] As we agree with Appellant that counsel was clearly ineffective in this regard, we reverse.

The law presumes that counsel has rendered effective assistance. *See Commonwealth v. Balodis,* 747 A.2d 341 (Pa.2000). Therefore, to prevail on an ineffectiveness claim, Appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel's course of conduct was without a reasonable basis designed to effectuate his interest; and (3) he was prejudiced by counsel's ineffectiveness, *i.e.,* that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different. *See Commonwealth v. Douglas,* 558 Pa. 412, 737 A.2d 1188, 1199 (1999). This Court has made it clear that counsel's failure to prepare for trial is "simply an abdication of the minimum performance required of defense counsel." *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994). Moreover, this Court has determined that in a death penalty case, "it is not possible to provide a reasonable justification for [defending a case] without thorough preparation." *Id.*

Here, during the post-verdict hearings, Mr. Turner testified regarding his failure to meet with Appellant prior to trial as follows:

Q. [Appellant's appellate counsel]: I see. Now, you tried Billy Brooks trial before a jury before Judge Halbert, isn't that true?

A. [Mr. Turner]: That is correct.

Q. And prior to picking the jury, you had never met Mr. Brooks, isn't that true?

stances of his offense, 42 Pa.C.S. § 9711(e)(8), and the jury found this mitigating circumstance.

**6.** In *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 855 (2003), this Court concluded that notwithstanding the general rule announced in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002), that claims of ineffective assistance of counsel should be raised on collateral appeal, we may consider an ineffectiveness claim on direct appeal where the lower court has addressed that claim on the merits. Given that the trial court below addressed Appellant's ineffectiveness claim, we will likewise do so here pursuant to *Bomar.*

A. I had never met him personally, no, face to face, no.

Q. You had spoken to him one time over the telephone, is that correct?

A. No, I probably spoke to him more than one time over the telephone.

Q. Do you have a specific recollection of more than one conversation?

A. I have a specific recollection of one long conversation and I have some of others.

Q. How long was that one conversation?

A. Probably twenty minutes to a half hour.

Q. And you have no specific recollection of any other conversation prior to that?

A. I know I talked to him. But I have no specific recollection, no.

N.T., 7/16/1996, at 9–10. As this testimony makes clear, Mr. Turner never once met with Appellant in person before his trial on capital charges. In fact, Mr. Turner testified that he could only specifically recall one telephone conversation with Appellant, and that conversation lasted just twenty minutes to one-half hour. It should go without saying that no lawyer, no matter how talented and efficient, can possibly forge a meaningful relationship with his client and obtain adequate information to defend that client against first-degree murder charges in a single thirty-minute telephone conversation. Although a lawyer can always learn certain information from his client over the telephone, we simply would be discounting the gravity of a death penalty case were we to say that a lawyer representing a defendant in such a case has done his job effectively when he has spent only limited time on the telephone with his client. Indeed, the very nature of a capital case, typically quite involved and always subjecting the defendant to the possibility of death, clearly necessitates at least one in-person meeting between a lawyer and his client before trial begins. Without such a meeting, there is little to no hope that the client will develop a fundamental base of communication with his attorney, such that the client will freely share impor-

tant information and work comfortably with the lawyer in developing a defense plan. Moreover, only a face-to-face meeting allows an attorney to assess the client's demeanor, credibility, and the overall impression he might have on a jury. This is of particular importance in cases in which the client may take the stand in his defense or at the penalty phase in an attempt to establish the existence of particular mitigating circumstances. As Appellant was deprived of the benefits of a face-to-face meeting here, it is clear that Appellant's ineffectiveness claim has arguable merit.[7] *See Douglas,* 737 A.2d at 1199.

██ It is equally clear that Mr. Turner had no reasonable basis for failing to meet with Appellant in person prior to trial. During the post-trial hearing, when Mr. Turner attempted to explain why he never went to Holmesburg to speak with Appellant, Mr. Turner conceded that he had not been "looking forward to spending any time alone with Mr. Brooks," apparently because Appellant's previous attorneys had indicated to Mr. Turner that Appellant was "contentious."[8]   N.T.,

7. The Commonwealth argues that while Mr. Turner did not meet with Appellant in person prior to trial, this fact is not in itself dispositive as to whether counsel rendered ineffective assistance. In support of its argument, the Commonwealth points to this Court's decision in *Commonwealth v. Mason,* where we stated that "it is well settled that, by itself, the amount of time an attorney spends consulting with his client before trial is not a legitimate basis for inferring the total extent of counsel's pre-trial preparation, much less the adequacy of counsel's preparation." 559 Pa. 500, 741 A.2d 708, 715 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000), *citing Commonwealth v. Bundy,* 491 Pa. 607, 421 A.2d 1050 (1980). In the first instance, the attorney in *Mason* met with his client on at least two or three occasions, whereas here, Mr. Turner did not meet with Appellant even once. In any event, while it may generally be true that the amount of time an attorney spends consulting with his client before trial does not necessarily indicate how prepared that attorney might be, an attorney who does not meet in person with his client *at all* prior to a capital trial simply cannot be deemed sufficiently prepared to defend his client's life.

8. Prior to Mr. Turner's appointment, Appellant had been represented by Robert Moreno, Esquire, who withdrew from the case after Mr. Turner's appointment. Appellant had also been represented by William James, Esquire during his preliminary hearing. Mr. Turner explained that these attorneys had told him that they had problems with Appellant and had labeled him as "hard headed." N.T., 1/8/1992, at 24.

7/16/1996, at 21, 27. Moreover, Mr. Turner stated that he thought it would be better to limit in-person contact with Appellant so as to avoid a potential conflict in their relationship. *Id.* at 27, 737 A.2d 1188. Mr. Turner also rationalized to the court that although he had intended to visit Appellant at Holmesburg a few days before the trial, he did not have time to follow through on his intention, noting: "now, I apologize for being busy, but I am. I have a full schedule." N.T., 1/8/1992, at 28. We agree with Appellant that these explanations do not support a finding that Mr. Turner had a reasonable basis for failing to meet with him. General fear of a potential conflict in the lawyer-client relationship and a busy schedule simply cannot serve as a reasonable basis for failing to have personal contact with a client prior to that client's trial on capital charges. To the contrary, failure to do so is "simply an abdication" of the most basic expectations of defense counsel in a capital case. *See Perry,* 644 A.2d at 709.

Finally, it is also clear that Appellant was prejudiced by Mr. Turner's failure to meet with him in person prior to trial. *See id.* As we have highlighted above, in order to prepare a defense to a charge of murder in the first degree, it is essential that at the very least, counsel meet with his client in person to, *inter alia,* gather information from the client, evaluate the client's demeanor, and try to establish a working relationship.

Accordingly, we agree with Appellant that he was denied effective assistance of counsel when Mr. Turner failed to meet with him even once before his trial on capital charges. Appellant's judgment of sentence is reversed, and we remand this case to the trial court for a new trial.

Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice LAMB files a concurring opinion.

Justice CASTILLE concurring.

Although I agree that appellant is entitled to a new trial, I respectfully disagree with the Majority's approach to the dispositive claim of ineffective assistance of counsel, as well as the apparent *per se* rule it would promulgate for instances where a lawyer fails to meet with his client face-to-face before trial in a capital murder case.[1] In my view, the Majority unquestionably errs in finding that appellant has adequately demonstrated that his counsel was ineffective under the performance and prejudice test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). Indeed, the Majority does not purport to find *Strickland/Pierce*-type prejudice. The germane and more difficult question is whether appellant is entitled to relief without having to show *Strickland/Pierce* prejudice. I believe that this inquiry is more properly governed by the U.S. Supreme Courts decision in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and its progeny. Although I deem the question here to be close, I would grant relief under *Cronic.*

Appellant raises a dozen claims of counsel ineffectiveness, but the Majority correctly reaches only his first claim. In that claim, appellant argues that his federal and Pennsylvania constitutional rights to the effective assistance of counsel were denied when his court-appointed attorney failed to prepare "in any manner" for trial, including a failure to meet with him face-to-face, failing to interview witnesses, and failing to conduct any investigation.[2] Appellant claims that counsel's dere-

---

1. In direct capital appeals such as this, this Court traditionally undertakes its own review of the sufficiency of the evidence to support the first degree murder verdict. *E.g. Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 839–40 (2003). Although the Majority awards a new trial, a finding that the evidence was insufficient, of course, would afford appellant greater relief in the form of a discharge. Upon review, I am satisfied that the evidence amply supported appellant's conviction of first degree murder.

2. Although appellant invokes both the federal and state constitutional charters, he does not argue that the right to counsel implicated by his

liction in this regard was so total that it led to "a complete breakdown in the attorney-client relationship [such that appellant] felt constrained to represent himself at the beginning of the trial, with highly prejudicial results." Brief for Appellant at 35. In appellant's view, counsel's "complete abdication of his responsibilities" created a situation where appellant "was, in essence, unrepresented at his capital murder trial." *Id.* at 37.

In granting relief, the Majority does not focus upon the entirety of this claim, but solely upon the constituent allegation that trial counsel failed to meet with appellant face-to-face.[3] The Majority holds that counsel's failure in this regard is sufficient to warrant a finding of ineffectiveness under the performance and prejudice standard which governs claims falling under *Strickland* and *Pierce*. In reaching this conclusion, the Majority suggests that lawyers in Pennsylvania capital cases are now **required** to engage in at least one face-to-face meeting with their client prior to trial, stating at one point that, "the very nature of a capital case, typically quite involved and always subjecting the defendant to the possibility of death, clearly necessitates at least one in-person meeting between a lawyer and his client before trial begins." *See* Majority op. at 337, 839 A.2d at 249.[4] Ultimately, though, the Majority does not apply its rule in the *per se* fashion this statement suggests. Instead, the Court proceeds to inquire into the proffered basis for counsel's failure to meet with appellant, deeming that decision to have been unreasonable.

claim differs under the two charters. Accordingly, appellant's claim is subject to a unitary analysis.

3.  I agree with the Majority that appellant's claim of counsel ineffectiveness is reviewable on this direct appeal, as it falls within the *Bomar* exception to the general rule set forth in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), which expressed a preference for deferring such claims to collateral review. I would note, however, that it is not simply the fact that the court below addressed the collateral claim which warrants review; rather, it is also essential that there was a hearing on the claim at which counsel testified.

4.  Although the Majority's analysis focuses upon the capital nature of this case, it later suggests that the face-to-face requirement obtains in all cases charging first degree murder. Majority op. at 339, 839 A.2d at 250.

*Id.* at 337–38, 839 A.2d at 249. The fact that the Majority actually assesses the objective reasonableness of counsel's proffered reasons for failing to meet his client in person in advance of trial suggests that there may be instances where such a decision could be deemed objectively reasonable.[5]

Turning to the *Strickland/Pierce* prejudice standard, the Majority recognizes that such an analysis requires a determination "that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would be different." Majority op. at 336, 839 A.2d at 248. But the Majority makes no such determination. The Majority does not conclude that under the circumstances of this case there is a reasonable probability that, but for counsel's failure to meet appellant in person prior to trial, the outcome of the guilt phase of this trial would have been different. Instead, the Majority simply reiterates its earlier, *per se* conclusion (when discussing arguable merit) that counsel must meet with his client at least one time, face-to-face, prior to trial.[6]

5. For reasons I shall discuss below, I too would leave open the prospect that such a decision might be deemed reasonable under certain circumstances, such as where the defendant refuses to meet with counsel or where counsel employs other technological means satisfying the same purpose as a face-to-face meeting.

6. In granting relief in the instant case, the Majority relies primarily upon *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2d 705 (1994). However, *Perry* is distinguishable. For one thing, the dereliction in that case did not involve a mere failure to meet with the client but also "failure to investigate a potential eyewitness, gross inattention to the capital nature of [the] client's plight, failure to prepare for the penalty phase of trial, failure to present known character witnesses, and presentation of such a pitiful parody of a defense case at the penalty phase hearing...." *Id.* at 709. Moreover, the Court in *Perry*, unlike the Majority here, explained how those derelictions affected the reliability of the outcome:

> This is a case where the evidence might have supported a lesser degree of homicide than first degree murder; it is also a case in which a death penalty jury might have rendered a verdict of life imprisonment if appellant's counsel had presented character witnesses and other mitigating factors.... It therefore seems quite clear that the result of the trial might have been different were it not for counsel's errors.

> *Id.*

In any event, if *Perry* stood for the proposition that the *Strickland/Pierce* rubric permits a conclusion of ineffectiveness without a

Because the Majority is unable to articulate the "probable effect upon the outcome" type of actual prejudice required under *Strickland/Pierce*, its unspoken assumption must be that an unreasonable failure to meet with one's client **automatically** renders the verdict at trial unreliable. Nevertheless, there is a narrow place in Sixth Amendment jurisprudence for claims of counsel ineffectiveness where prejudice is presumed in this fashion—*i.e.*, where such claims are not subject to the *Strickland/Pierce* test. The Majority's failure to come to terms with the Sixth Amendment complexity posed by the issue *sub judice* has led it to articulate a rule that cannot be squared with existing and controlling jurisprudence.

The universe of potential claims arising from an alleged denial of counsel, or an alleged deficient performance by counsel, is not confined to the circumstances governed by *Strickland/Pierce*. Indeed, on the very same day that *Strickland* was decided, the Supreme Court also decided *Cronic*, a case which addressed situations where it might be appropriate to deem counsel ineffective without inquiring into whether counsel's dereliction actually prejudiced the defendant at trial. The Court recently summarized the interplay of these two distinct Sixth Amendment doctrines as follows:

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence." This right has been accorded, we have said, "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, *see Strickland v. Washington*, 466 U.S. 668, 685–86, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and it also follows

showing of actual prejudice, *i.e.*, that the outcome of the proceeding would have been different but for counsel's ineffectiveness, it would be mistaken. It is also worth noting that *Perry* was decided after the trial in this case. To the extent that the Majority reads *Perry* as establishing a face-to-face meeting requirement, counsel cannot be deemed ineffective for failing to anticipate that decision. *Commonwealth v. Lopez*, 559 Pa. 131, 739 A.2d 485, 500 n. 18 (1999).

that defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation. As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694, 466 U.S. 668, 104 S.Ct. 2052.

There is an exception to this general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. *See Cronic, supra,* at 658–59, 466 U.S. 648, 104 S.Ct. 2039. But only in "circumstances of that magnitude" do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict. *Cronic, supra,* at 659, 466 U.S. 648, 104 S.Ct. 2039.

*Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 1240–41, 152 L.Ed.2d 291 (2002) (additional citations omitted). Later that same Term, the Court further elaborated upon the contours of the *Cronic* exception to *Strickland* as follows:

In *Cronic,* we considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial.... We determined that the court had erred and remanded to allow the claim to be considered under *Strickland's* test.... In the course of deciding this question, we identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" ....

First and "[m]ost obvious" was the "complete denial of counsel" .... A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at a critical stage, a phrase we used in *Hamilton v. Alabama,*

368 U.S. 52, 54, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), and *White v. Maryland,* 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (per curiam), to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused.[FN3] Second, we posited that a similar presumption was warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing" . . . . Finally, we said that in cases like *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. . . .

---

[FN3]. In a footnote, we also cited other cases besides *Hamilton v. Alabama* and *White v. Maryland* where we found a Sixth Amendment error without requiring a showing of prejudice. Each involved criminal defendants who had actually or constructively been denied counsel by government action. *See [Cronic,* 466 U.S. at 659 n. 25, 104 S.Ct. 2039] (citing *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (order preventing defendant from consulting his counsel "about anything" during a 17–hour overnight recess impinged upon his Sixth Amendment right to the assistance of counsel); *Herring v. New York,* 422 U.S. 853, 865, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (trial judge's order denying counsel the opportunity to make a summation at close of bench trial denied defendant assistance of counsel); *Brooks v. Tennessee,* 406 U.S. 605, 612–13, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (law requiring defendant to testify first at trial or not at all deprived accused of "the 'guiding hand of counsel' in the timing of this critical element of his defense," *i.e.,* when and whether to take the stand); *Ferguson v. Georgia,* 365 U.S. 570, 596, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (statute retaining common-law incompetency rule for criminal defendants, which denied the accused the right to have his counsel question him to elicit his statements before the jury, was inconsistent with Fourteenth Amendment); *Williams v. Kaiser,* 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398 (1945) (allegation that petitioner requested counsel but did not receive one at the time he was convicted and sentenced stated case for denial of due process)).

*Bell v. Cone,* 535 U.S. 685, 695–96, n. 3, 122 S.Ct. 1843, 1850–51, n. 3, 152 L.Ed.2d 914 (2002) (additional internal citations to *Cronic* omitted).

Because *Cronic* spares a criminal defendant the burden of proving prejudice, it is not surprising that much of the decisional law arising in its wake has involved defendants attempting to expand *Cronic* to encompass claims that more properly

sound under *Strickland.* *See, e.g., Bell, supra; Mickens, supra.* As evidenced by the imprecision of appellant's own argument, the claim presented here implicates the fine line between *Strickland* and *Cronic* as well. As for *Strickland/Pierce*, appellant argues that he was actually prejudiced in that counsel's failure to meet with him, among other lapses, led to a complete breakdown in the attorney-client relationship, to the point that appellant elected to represent himself at the outset of trial. This type of argument addressing prejudice at least makes a minimal attempt to tie trial counsel's pre-trial lapse to the actual conduct of the trial. The argument ultimately fails on the merits, however, because it necessarily assumes that self-representation automatically results in an unreliable verdict, which is simply not so.[7]

In my view, the true gravamen of appellant's complaint is that counsel's failure to so much as meet with him in advance of this capital trial led to a circumstance where he was effectively "unrepresented" by counsel at critical stages of the case. As the Majority notes, appellant represented himself at critical stages of the proceedings (with appointed counsel acting as stand-by counsel), including portions of the suppression hearing, opening statements at trial, and the first day of trial. Although appellant requested permission to represent himself, the record makes clear that he did so only because of the total breakdown in the attorney-client relationship occasioned by counsel's failure to meet with him, to return phone calls, or to respond to written communications. Majority op. at 334–35 n. 3, 839 A.2d at 247 n. 3 (summarizing appellant's representations below). Trial counsel's testimony demonstrated that there was no valid reason for his keeping his client beyond arm's length and failing to foster even a minimal professional level of attorney/client relationship. Obviously,

---

7. I recognize that appellant does allege, as separate claims of ineffectiveness, many specific instances where counsel's performance at trial was deficient. But, in forwarding his broad argument premised upon counsel's failure to meet with him in person and failure to adequately prepare, appellant does not rely upon those or other instances at trial as proof of *Strickland/Pierce* prejudice. Nor, in actually finding counsel to be ineffective, does the Majority cite any instance of actually deficient and prejudicial performance at trial.

instances of client dissatisfaction with counsel are legion and generally, as a rule, provide no ground for relief. It is not a "denial" of counsel anytime a criminal defendant is dissatisfied with his court-appointed attorney and asks to represent himself as a consequence. But, in this instance, there was a basis in fact for appellant's dissatisfaction and an objectively reasonable (as opposed to subjective) belief that the attorney-client relationship was not salvageable, a basis stemming from counsel's failure to meet with appellant at all prior to commencement of the capital trial. In my view, this is one of those rare "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104 S.Ct. at 2046. Accordingly, I would hold that appellant, in this instance, is not required to demonstrate actual prejudice in the sense of proving the unreliability of the guilt-phase verdict.[8]

There is no precedent supporting adoption of the Majority's prophylactic constitutional rule; indeed, as I have detailed above, the *Strickland/Pierce* analysis eschews such a prophylactic approach. Because I do not believe that it is necessary to resolve the prophylactic face-to-face meeting question to properly decide this case, I disagree with the implicit suggestion by the Majority that the Sixth Amendment and/or Article I, Section 9 of the Pennsylvania Constitution impose such a requirement. Although I respectfully dissent from the Majority's analysis, I concur in the award of a new trial given the circumstances in this capital matter.

Justice EAKIN concurring.

I agree counsel's failure to meet with appellant prior to his murder trial comprises ineffectiveness, but make this conclu-

---

**8.** The Majority's *per se* rule seems to require the actual physical presence between the lawyer and client and overlooks the reality that there may be other adequate methods by which to accomplish the goals of a "face-to-face" meeting through evolving telecommunication methodologies or by intermediaries. I would not foreclose the use of such technology or intermediaries to satisfy that which the Majority attempts to mandate by a *per se* rule. In addition, there may be instances where the defendant himself refuses to meet with counsel.

sion under the traditional and long-standing *Pierce*[1] test; a separate analysis is not necessary solely because this is a capital case. In all cases, capital or not, counsel is presumed effective and it is up to a defendant to prove otherwise by showing: (1) the underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there exists a reasonable probability that the outcome of the challenged proceeding would have been different. *Pierce*, at 194–95.

The majority may be read as establishing a standard in capital cases that differs from that of other cases, a distinction which is unnecessary, in my judgment. Failing to meet with a client in a capital case may be ineffective in nearly every scenario; failing to meet on a disorderly conduct charge may be more easily explained. Either situation, however, may be evaluated under *Pierce*. It is important that the law be consistent; the constitution does not afford some lesser right to effective counsel on those charged with non-capital crimes. The right to counsel inures to the capital defendant, the felon, and the misdemeanant alike. Stewardship of capital counsel is always the most carefully scrutinized conduct of all, and rightly so, but proper scrutiny is available under the prevailing standards of *Pierce*; ignoring the *Pierce* factors in favor of a *per se* rule is unnecessary. Insofar as it suggests different standards of scrutiny for capital cases, it will be only the first entry on a list of *per se* rules we will be asked to create, a concept that seems unwise as well as unneeded.

Justice LAMB concurring.

I join the majority opinion, with which I completely agree, but write separately to voice my concern that both the trial court and the district attorney's office need to be diligent in making sure that the representation of a defendant, particularly in a capital case, is effective. Surely, no one today can doubt that a defense lawyer must, at a minimum, have face-to-

---

1. *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 194–95 (1994); see also *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

face contact with his client pre-trial to effectuate effective representation. While all participants in the criminal justice system have their separate responsibilities, the trial judge and the district attorney must be particularly sensitive to ensuring the rights of the criminal defendant, even if defense counsel himself is not as vigilant.